**NAHTEL CORPORATION et al. v. WEST VIRGINIA PULP & PAPER CO. et al.**

**No. 109.**

Circuit Court of Appeals, Second Circuit.

March 15, 1943.

Herman B. Goodstein, of New York City (James F. Donnelly, Terence J. McManus, and Walter E. Ernst, all of New York City, of counsel), for appellants.

H. Lewis Brown, of New York City, (Gann, Secord, Stead & McIntosh, of Chicago, Ill., and Burroughs & Brown, of New York City, of counsel), for appellees.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from a judgment awarding the complainants six cents damages and otherwise limiting the right of recovery which they claim against the defendants because of an alleged violation by the latter of a "settlement agreement" dated August 31, 1934. The complainants seek to hold the defendants in substantial damages and also to have them account for profits accruing through the alleged breach.

The Pictorial Review Magazine was a woman's periodical that, up to 1926, had

considerable success but thereafter had lessened earnings resulting in losses of more than $500,000 in 1929 and in the succeeding two years of an aggregate of more than $1,470,000. The defendant West Virginia Pulp and Paper Company (hereafter called West Virginia) had for years supplied the magazine with paper, and W. F. Hall Printing Company (hereafter called Hall) had done its printing. The corporate complainant had operated both the magazine and a pattern business. About the end of the year 1931 West Virginia and Hall refused further credit. At this time a contract was made under date of December 17, 1931, between the defendants and the corporate complainant, then known as Pictorial Review Company of New York, to sell its assets to Pictorial Corporation, a newly formed holding company, later renamed Rightway, for $150,000 to be paid on the making of the contract, and further sums aggregating $1,350,000 to be paid between January 1, 1932, and January 1, 1942. Of these sums $175,000 only was paid. The corporate complainant had no claim against Pictorial Review Company of Delaware, later renamed Edgeway, the operating company in which Pictorial Corporation vested title to the business under the contract, but only against Pictorial Corporation, which owned all their stock, and this claim was subordinated to the defendants' claims of $1,052,000 which Pictorial Corporation had assumed. The contract provided that if the latter should be adjudicated insolvent, become a bankrupt, or go into voluntary liquidation, no part of the $1,350,000 should be paid until all indebtedness to West Virginia and Hall was discharged in full. In view of the failing fortunes of the business and the large indebtedness, the contract essentially amounted merely to a transfer of the assets for $175,000 to an operating company, the stock of which was held by Pictorial Corporation, and a negligible chance of some further payment if the magazine, whose losses had risen from $157,000 in 1927 to $654,000 in 1930, might so far reverse this trend as to earn enough profits to enable it to pay very large prior obligations. This contract is referred to only to show the speculative nature and essential worthlessness of the complainant's claim in December, 1931.

During the next two and one-half years both Pictorial Corporation and its operating company got in worse and worse financial condition, so that the operating company owed West Virginia and Hall about $3,900,000, while Pictorial Corporation still owed them the $1,052,000 which it had assumed at the time it contracted for the purchase of the business. The assets of the operating company, excluding the book value of the good-will, were some $3,500,000 less than its liabilities.

Under the above circumstances, the defendants on August 7, 1934, entered into an agreement with International Magazine Company, a Hearst organization. This contract provided for the formation of a new company to be called Laurelton, to which were to be transferred the assets of both the publishing and pattern business, but the real estate was to be held for the account of the transferor. The management and operation of the business was to be by the Hearst Corporation for two years and for the account of the latter so far as there might be any profits. It was to be responsible for any losses over the sum of $1,500,000. The defendants agreed to loan Laurelton during the two year period up to $1,500,000, which they actually did, taking obligations of Laurelton for the instalments as loaned. Under the contract the Hearst corporation was given an option, to be exercised at any time during the two year period, to purchase the assets of Laurelton, other than its real estate, by paying the amount of the net current assets of the magazine business as of the date Hearst took over the management, or $48,872.43, by paying the defendants for loans made by them during the two year period up to $1,500,000 and also by paying Laurelton $500,000 out of any profits realized from the pattern business.

The complainants and others objected to this arrangement and threatened suit. As a result the complainants made a contract of settlement with the defendants West Virginia and Hall and with the Rightway Corporation (formerly known as Pictorial Corporation), with Edgeway Corporation (formerly known as Pictorial Review Company of Delaware) which was the owner of the stock of Laurelton, and whose stock was in turn held by Rightway, and with Laurelton. Under this contract, which was dated August 31, 1934, West Virginia and Hall were to supervise the liquidation of Rightway, Edgeway and Laurelton and were to pay the complainant corporation 20% of the proceeds of liquidation applicable to such claims against the three

corporations as accrued to defendants prior to August 31, 1934. As an initial instalment the defendants paid the sum of $35,000. On August 31, 1936, at the end of the two year period, Rightway still owed the defendants $1,052,000, Edgeway owed them $4,100,000, and Laurelton had current assets of $527,000 in addition to a claim of $1,160,000 against the International Magazine Company representing its liability for operating losses in excess of $1,500,-000. The liabilities of Laurelton amounted all together to about $3,700,000, of which some $3,250,000 represented indebtedness to the defendants.

While under the contract of August 31, 1934, the defendants West Virginia and Hall were to supervise liquidation of Rightway, Edgeway and Laurelton, and to pay to Nahtel 20% of cash received by them in the liquidation on account of claims they had against these corporations before August 31, 1934, the agreement may not be construed to permit them to take steps to effect liquidation in a manner inconsistent with the option held by the Hearst interests since an agreement to do so would have been an unlawful interference with the International Magazine Company's contract rights. American Newspapers, Inc., a Hearst company, was on May 7, 1935, substituted as a party to the old agreement of August 7, 1934, for International Magazine Company. The two year period provided for operation of the business by the Hearst interests expired on September 1, 1936, and, because of the excessive losses incurred in conducting the business, American declined to exercise its option. Edgeway therefore sold to American the entire capital stock of Laurelton (the corporate name of which had meanwhile been changed to Pictorial Review Company, Inc.). By the contract providing for transfer the defendants agreed to finance American to the extent of $1,716,667, which sum they advanced and lost. They also released Pictorial Review Company, Inc. (formerly Laurelton), from their claims to the extent of $1,212,111, while American agreed to operate the business for a period of two years and ten months and to make good losses of Pictorial to a maximum amount of $916,667, provided that contracts between Pictorial and the defendants to furnish paper and to do the printing for the magazine should be or remain in effect for ten years. The defendants made a profit upon paper and printing furnished Pictorial under these contracts amounting to $812,703.74, but to earn it they lost on money advanced by them $2,309,559.42. Early in 1939, American, after losing nearly $700,000 during this period, abandoned the enterprise.

Nahtel contends that the defendants broke the contract sued upon by failing to liquidate the properties as agreed and especially by causing the pattern business to be transferred on December 1, 1935, to a company known as Simplicity Patterns. If the Hearst corporation had exercised the option and had taken over the patterns it would have been bound to pay $500,000 out of any profits yielded by that business during a specified term, but there was no reasonable chance of any profits from the pattern business since it had sustained an average loss of $52,000 per month, or $785,000 in the aggregate, during the operation by the Hearst company between September 1, 1934, and December 1, 1935. At the end of the two years, that is, on September 1, 1936, Laurelton (later Pictorial Review Company, Inc.) had an indebtedness of $3,700,000 as against assets of only about $1,687,000. Accordingly even if the pattern business had been retained and its assets liquidated by sale there would have been no balance to carry over to Edgeway, the parent company, from which the defendants would realize anything out of which 20% would be payable to Nahtel. Even if the defendants were remiss in their duties as liquidators of this enterprise in permitting transfer of the pattern business, their liability was to restore the value so lost, if any, to the enterprise, and such restoration would be of no advantage to the complainants. But the transfer may well have been a proper step in the general scheme of liquidation. There had been such a large loss from operating the pattern business between September 1, 1934, and December 1, 1935, that Simplicity Patterns would not agree to take it over unless the patterns were augmented by $250,000 cash so that the risk of continuing operation for a limited period would be guarded against. The pattern business was sold on December 1, 1935, because the Hearst interests had announced that they would not exercise their option if the unprofitable pattern unit was to be included and it was to be necessary to continue to meet the ad interim losses.

Appellants contend that the defendants were bound by the contract of settlement

to liquidate Rightway, whose sole asset was the stock of Edgeway; Edgeway whose sole asset was the stock of Pictorial Review Company (Laurelton); and Pictorial Review Company which was the operating company that had been organized under the agreement of August 7, 1934. Manifestly there could be no liquidation while the option period lasted without the concurrence of the Hearst interests. That period had two years to run after the date of the settlement on September 1, 1934. At that time Nahtel had no equity in any of the corporations referred to. The defendants then had claims of $3,250,000 against Pictorial, the assets of which had a value of only $1,687,000, so that there could be no equity in the stock of Pictorial in which Nahtel could share. Even if the option had been exercised Nahtel would only have been entitled to 20% of $48,872.43 (the value of the assets of the magazine division) plus the possibility of 20% of $500,000 to be paid from the earnings of the pattern business, or a total of $109,-774.49, less the $35,000 which Nahtel had already received. But we have shown that there could not have been any profit realized out of the pattern division. Moreover, the option was not exercised.

At the time of the settlement Nahtel had no claim against Edgeway which held all the stock of Pictorial (Laurelton) and Edgeway then had an excess of liabilities over assets of approximately $3,500,000. Nahtel did have a claim against the parent company Rightway. Rightway had no assets but the worthless stock of Edgeway. Nahtel's claim against Rightway was at first subordinated to the claim of the defendants for $1,052,000 already mentioned, and by the 1934 settlement it was authorized to receive 20% of what Rightway might receive for its worthless stock in a subsidiary whose only asset was more worthless stock in a second subsidiary which was hopelessly insolvent.

█ It is evident from the foregoing that when the option period expired the defendants were not able to do anything to liquidate any of the corporations that would be of advantage to Nahtel. The entire enterprise viewed as an aggregate of corporations had become indebted to the defendants in huge sums. The sale to American and the continuance or extension of the existing printing and paper contracts were not steps in a conspiracy against Nahtel but were only final attempts of the defendants (attempts which, in fact, proved futile) to lessen their losses. If, as the court below held, there was a technical breach of contract and the defendants were guilty of a wrong in not adopting some other form of liquidation than the sale of Pictorial stock to American, nevertheless there was no tangible loss to Nahtel. If, on the other hand, in transferring the stock of Pictorial to American the defendants adopted the only practical mode of liquidation there not only was no loss but no breach of contract, technical or otherwise.

█ Nahtel attempts to alter the picture by adding certain book values of good-will to the corporate assets but there was no good-will of any worth in corporations that had a history of such long continued deficits. Crawford v. Mexican Petroleum Co., 2 Cir., 130 F.2d 359.

It is further argued that the agreement of American to make good the advances of the defendants to Pictorial of $1,500,000 was a claim that accrued to the defendants prior to August 31, 1934, and that Nahtel was, therefore, entitled to 20% of that amount. But no part of $1,500.000 accrued until it was actually advanced and it was not advanced until after September 1, 1934. Under such circumstances, it seems clear that Nahtel established no right to recover any part of that item. We also think that complainants' further contention that the agreement of the Hearst corporation to make good losses incurred during the period in which it operated the business of Pictorial covered capital as well as income losses is without reasonable basis and that the trial judge was right in holding that the agreement only applied to operating losses as it did to operating profits. Any other interpretation would involve a most unlikely kind of guaranty.

Before the defendants and the Hearst company entered into the contract of August 7, 1934, there had been numerous attempts to dispose of the Pictorial Review Magazine, none of which succeeded. We think that the defendants did all they could reasonably be expected to do to realize upon this asset and that the complainants have no valid claims against the defendants except perhaps claims affecting the real estate which were reserved in the judgment and as to which we express no opinion.

Judgment affirmed with costs to the appellees